NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| NICHOLAS KRAMER, et al. : | |
| : | Civil Action No. 09-3767 (PGS) |
| Plaintiffs, : | |
| : | OPINION |
| v. : | |
| : | |
| CITY OF JERSEY CITY, et al. : | |
| : | |
| Defendants. : | |

**SHERIDAN, U.S.D.J.**

This matter comes before the Court on Defendants' motions to dismiss Plaintiffs' complaint pursuant to Federal Rules of Civil Procedure ("Rules") 12(b)(6) and 12(c). Plaintiffs allege civil rights violations of the First, Fourth and Fourteenth Amendments against municipal state officials pursuant to 42 U.S.C. 1983, violations of the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. 12101, and violations of New Jersey law. For the following reasons, the Court grants Defendants' motion to dismiss based upon qualified immunity.

**I.      BACKGROUND**

Plaintiffs, Nicholas Kramer, Brian McGovern, and Patrick Fay filed an Amended Complaint on August 3, 2009; during the course of this litigation, Plaintiffs John Bado, Stefano Petrillo, Michael Stise, and Victor Vargas filed a second action with this Court alleging identical claims and legal arguments against the same Defendants (collectively "Plaintiffs"). All seven plaintiffs are police officers with the Jersey City Police Department ("JCPD"). With agreement from all parties

1

the two cases were consolidated for all purposes.

Defendants are the City of Jersey City, Thomas Comey (the Chief of Police for the JCPD) (the "JC Defendants"), the City of New York, Daniel Carrione (a captain with the New York Police Department ("NYPD") Internal Affairs Bureau) ("the NYC Defendants"), and Dr. Edward Boylan and Midtown Occupational Medicine, LLC (the "Boylan Defendants") (collectively "Defendants").[1]

All Defendants raise the doctrine of qualified immunity as an absolute bar to suit in this case. Additionally, the Boylan Defendants raise the following arguments in support of their motion to dismiss: (1) that there is no individual liability under the ADA, thus precluding Plaintiffs' ADA claims against him; (2) that he is not a state actor as required under § 1983; and (3) alternatively, if the court concludes he did engage in the requisite state action, the doctrine of qualified immunity bars the Plaintiffs' § 1983 claims against him. New York City and Jersey City also assert that if the Court grants qualified immunity to the individual actors, then the corresponding § 1983 claims against the municipalities should be dismissed because Plaintiffs have failed to show an underlying constitutional violation.

Plaintiffs allege that they suffered from various medical conditions that required them to seek medical treatment. (Kramer Am. Compl. ¶¶ 32-38.) For example, Kramer alleges that a licensed medical professional prescribed him hormone replacement drugs to treat erectile dysfunction and hypogonadism.[2] (*Id.* ¶ 33.) McGovern alleges that he was diagnosed and treated for hypogonadism,

---

[1] Plaintiffs brought their claim against Dr. Boylan individually and as an employee of Midtown Occupational Medicine, LLC, which is a medical practice solely owned by Dr. Boylan where he is also the sole employee. Dr. Boylan and Midtown Occupation Medicine, LLC, are effectively the same entity for purposes of this motion.

[2] Kramer alleges that he first visited a New Jersey physician in December 2006, and continues to be under the treatment of a physician. (*Id.* ¶ 33.)

erectile dysfunction, impotence, and fatigue and also was prescribed hormone replacements.[3] (*Id.* 35.) Fay alleges he was diagnosed and treated for hypogonadism, erectile dysfunction, arthralgia, and fatigue and was similarly prescribed hormone replacements.[4] The plaintiffs in the *Bado* action allege identical allegations as to their diagnoses and medical prescriptions.[5]

Plaintiffs allege that their medical treatment was permitted by state regulation (N.J.A.C. 3:35-7) and that Plaintiffs' JCPD health provider covered the treatment. (*Id.* ¶¶ 38-39.) Plaintiffs allegedley filled their prescriptions at various pharmacies, including Lowen's Pharmacy ("Lowen's"), located in New York City. (*Id.* ¶ 40.) Plaintiffs allege that it was unknown to them at the time that Lowen's "utilized foreign, federally unapproved components of drugs" and that it is "unknown whether the pharmacy may have filled some of the Plaintiff's prescriptions with such materials." (*Id.* ¶ 42.)

On or about early 2008, the NYPD subpoenaed the prescription records at Lowen's as part of a grand jury investigation into Lowen's use of unlawful, foreign drug components.[6] Although Captain Carione of the NYPD was chiefly concerned about unsafe use of steroids by its police, he

---

[3] McGovern alleges that he first visited a doctor on or about early 2004 and stopped his treatment in July 2008. (*Id.* ¶ 34.)

[4] Fay alleges his first visit to a physician was in the Fall of 2006 and ended his treatment on or about May 2008. (*Id.* ¶ 36.)

[5] In the *Bado* complaint, the four plaintiffs make identical allegations, and specifically state that the hormone replacement drugs they received for the same conditions were HCG, Testoterone, Nordiflex HGH, Phendimetrazine, Phentermine, and Norditropin. (Bado Compl. ¶ 37.)

[6] Plaintiff's allege that the subpoena was part of a grand jury investigation and as such "New York criminal law requires evidence and testimony utilized for grand jury proceedings" to be confidential. (Kramer Am. Compl. ¶ 44.) However, there is no evidence that any evidence or testimony that was part of the grand jury proceedings was disclosed.

noticed that JCPD officers were also frequenting Lowes. As a result, on February 12, 2008, Captain Carione of the NYPD wrote to Chief Comey of the JCPD explaining the status of the investigation and asked that Comey provide him with a list of all JCPD personnel names so that he could compare it with the customer lists obtained from Lowen's. (*Id.* ¶ 45.) Chief Comey complied. Captain Carrione's search found about fifty (50) JCPD officers were Lowen's customers. Generally, high steroid levels is linked to aggressive behavior. On or about February 20, 2008, Plaintiffs allege that they were "among the more than fifty (50) law enforcement personnel that were taken into custody by the JCPD Internal Affairs Unit and compelled to provide a urine sample for testing for the presence of the medically prescribed steroid drugs." (*Id.* ¶ 46.)

As a result, on February 20, 2008, at Chief Comey's direction, Plaintiffs were required to undergo testing for the presence of steroids. (*Id.* ¶ 46.) The JCPD hired the Boylan Defendants to evaluate Plaintiffs' drug test results to determine whether each officer was fit for duty. The drug testing was not in compliance with the New Jersey Attorney General Drug Testing Guidelines ("AG Policy") since it did not list steroids as a banned drug. (*Id.* ¶ 49.) During this time, Plaintiffs were placed on some form of modified duty. According to Plaintiffs, "modified duty results in the officer being unable to wear his uniform, possess a City weapon, or work off-duty jobs through the department, and was required to report to the radio room." (Compl. ¶ 51.)

The JCPD treated each Plaintiff generally the same. The JCPD officers whose names appeared in Lowen's records were transported to the JCPD Internal Affairs office where they were required to disclose all medications they have taken within the last sixty (60) days. They were also compelled to provide a urine sample. As a result, based upon the testing and the medical advice from the Boylan Defendants, the Plaintiffs' steroid levels were too high for them to be fit for

unrestricted duty. Therefore, Chief Comey placed each plaintiff on modified duty until further drug testing demonstrated that their steroid levels had decreased to an acceptable level. Except for Kramer, all were returned to full duty without having been suspended. Kramer's circumstances were different because his steroid levels did not return to an acceptable level based upon medical advice from the Boylan Defendants. On or about August 20, 2008, Kramer was suspended without pay because of "unacceptably elevated Testosterone/Epitestosterone (T/E) levels" and he was afforded a Preliminary Notice of Disciplinary Action. (*Id.* 56.) On January 14, 2009, Kramer was eventually returned to full duty after a 159-day suspension without pay.

## II.     DISCUSSION

### A.     Motion to Dismiss–Standard of Review

On a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), the Court is required to accept as true all allegations in the Complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. *See, e.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-50 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1384 (3d Cir. 1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. *Iqbal*, 129 S.Ct. at 1950.

While a court will accept well-pled allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *See Iqbal*, 129 S. Ct. at 1949; *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir.1997). "The pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these

elements exist.'" *Kost v. Kozakewicz*, 1 F.3d 176, 183 (3d Cir.1993) (quoting 5A Wright & Miller, Fed. Practice & Procedure: Civil 2d § 1357 at 340). The Supreme Court has held that "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do, . . . . Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (internal citations and quotations omitted); *see also Iqbal*, 129 S. Ct. at 1949-50.

Federal Rule of Civil Procedure 12(c) permits a party to "move for judgment on the pleadings." "The standard for deciding a motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is identical to that under Rule 12(b)(6)." *Celgene Corp. v. Teva Pharms. USA, Inc.*, 412 F. Supp. 2d 439, 443 (D.N.J. 2006).

## B. The Doctrine of Qualified Immunity

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800 (U.S. 1982) (citing *Procunier v. Navarette*, 434 U.S. 555 (1978) and *Wood v. Strickland*, 420 U.S. 308 (1975)). "The qualified immunity standard 'gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law.'" *Gilles v. Davis*, 427 F.3d 197, 203-04 (3d Cir. 2005) (citing *Hunter v. Bryant*, 502 U.S. 224, 229 (1991)). When applying qualified immunity, the court first asks whether "the facts alleged, viewed in the light most favorable to the party asserting the injury, show

that the [official's] conduct violated a constitutional right." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). The second question inquires whether it would be objectively reasonable for the official to have known his conduct was unlawful in the situation he confronted. *Saucier v. Katz,* 533 U.S. 194, 202 (2001).[7] "The defense of qualified immunity is a recognition of the fact that subjecting public officials to personal liability for their discretionary actions results in the distraction of those officials from their public duties, inhibits their discretionary actions and, quite possibly, deters qualified people from accepting public service." *Ryan v. Burlington County, N.J.,* 889 F.2d 1286, 1292 (3d Cir. 1989). The Court must balance the "interest in allowing public officials to perform their discretionary functions without fear of suit against the public's interest in vindicating important federal rights." *Id.* (citing *Anderson v. Creighton,* 483 U.S. 635, 638 (1987) and *Hynson v. City of Chester*, 864 F.2d 1026 (3d Cir.1988)).

In *Harlow*, the Supreme Court held that "[r]eliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." 457 U.S. at 818. In evaluating qualified immunity, the court examines the reasonable conduct of the official at the time when the official acted and determines whether the official acted with reasonable knowledge that his conduct violated an established law. *See Harlow*, 457 U.S. at 818.

---

[7] While the U.S. Supreme Court has held that the two-step process outlined in *Saucier* for qualified immunity analysis is flexible, it has held that "[b]ecause the two-step *Saucier* procedure is often, but not always, advantageous, the judges of the district courts and the courts of appeals are in the best position to determine the order of decisionmaking will best facilitate the fair and efficient disposition of each case." *Pearson v. Callahan,* 129 S.Ct. 808, 821 (U.S. 2009).

### 1. Chief Comey and City of Jersey City

Upon a thorough review of the complaint, the Court concludes that Chief Comey is entitled to qualified immunity. The test for qualified immunity involves two steps: (1) whether the conduct of the official clearly violated a constitutional right; and (2) whether it would have been objectively reasonable for the officer to know that his actions were unlawful in the circumstances he faced.

First, Chief Comey's actions to mandate drug testing for steroid use among the Plaintiffs and place them on modified duty pending those results did not violate any federal law. The issue of state-imposed drug testing of government officials is not a new one. *See, e.g., Skinner v. Railway Labor Executives Ass'n*, 489 U.S. 602 (1989) (upholding drug testing of railroad employees); *Treasury Employees v. Von Raab*, 489 U.S. 656 (1989) (upholding suspicion-less drug testing of customs officers that carry firearms); *Bolden v. Se. Pa. Transp. Auth.*, 953 F.2d 807 (3d Cir. 1991) (holding that train maintenance custodians did not fall into the "safety sensitive" type positions that would be covered by random drug testing).[8] The legal analysis in these cases depends upon whether

---

[8] Many courts have upheld random drug-testing of government employees because of the safety-sensitive type of position at issue. *See, e.g., Int'l Broth. of Teamsters, Chauffeurs, W. Conference of Teamsters v. Dep't of Transp.*, 932 F.2d 1292 (9th Cir. 1991) (commercial drivers); *Hartness v. Bush*, 919 F.2d 170, 173 (D.C. Cir.1990) (employees with "secret" national security clearances); *Bluestein v. Skinner*, 908 F.2d 451, 455-57 (9th Cir. 1990) (aviation personnel); *Taylor v. O'Grady*, 888 F.2d 1189, 1199 (7th Cir.1989) (correctional officers); *Am. Fed'n of Gov't Employees v. Skinner*, 885 F.2d 884, 889-93 (D.C.Cir.1989), *cert. denied*, 495 U.S. 923 (1990) (transportation employees); *Nat'l Fed'n of Fed. Employees v. Cheney*, 884 F.2d 603, 610-13 (D.C.Cir. 1989) (Army civilian employees); *Thomson v. Marsh*, 884 F.2d 113, 115 (4th Cir. 1989) (chemical weapons plant employees); *Harmon v. Thornburgh*, 878 F.2d 484, 496 (D.C.Cir.1989), *cert. denied*, 493 U.S. 1056 (1990) (Justice Department employees with "top secret" clearance); *Guiney v. Roache*, 873 F.2d 1557, 1558 (1st Cir. 1989), *cert. denied*, 493 U.S. 963 (1989) (police officers); *Rushton v. Nebraska Public Power Dist.*, 844 F.2d 562, 567 (8th Cir.1988) (nuclear power plant employees); *McDonnell v. Hunter*, 809 F.2d 1302, 1308-09 (8th Cir.1987) (correctional officers). The instant case does not involve the issue of random drug testing. However, these line of cases are instructive in evaluating the government interests at stake here.

the drug test at question was random or based upon a reasonable individualized suspicion. *See Von Raab*, 489 U.S. at 668-70. In the context of random drug-testing protocols, the court balances the Government's interest in conducting suspicionless searches against the privacy expectation of those employees. *See id.* (allowing suspicionless searches for "certain, critical, safety-sensitive positions."); *accord Carroll v. City of Westminster,* 233 F.3d 208, 211 (4th Cir. 2000); *Ford v. Dowd,* 931 F.2d 1286, 1290 (8th Cir. 1991).

Police officers generally have a diminished expectation of privacy compared to other government employees. *See Policemen's Benevolent Ass'n of N.J., Local 318 v. Washington Tp. (Gloucester County),* 850 F.2d 133, 138 (3d Cir.1988) ("[P]olice officers may have lowered expectations of privacy because they have chosen to enter a highly regulated industry"); *Fraternal Order of Police, Lodge No. 5 v. City of Philadelphia,* 812 F.2d 105, 114 (3d Cir. 1987) (holding that police officers had little privacy interest in their medical information because they were being selected for highly stressful and dangerous positions); *Carroll v. City of Westminster*, 233 F.3d 208 (4th Cir. 2000) ("[C]ourts have long recognized that individuals in certain safety-sensitive professions, such as law enforcement, have a reduced expectation of privacy") *Brambrinck v. City of Philadelphia,* 1994 WL 649342, at *13 (E.D.Pa. Nov. 15, 1994) ("[P]olice officers may sometimes have to lower their expectation of privacy in the context of their employment as police officers in whom the public has placed its trust.") (citing *O'Connor v. Ortega,* 480 U.S. 709, 717(U.S. 1987)); *McKenna v. City of Philadelphia*, 771 F. Supp. 124, 127 (E.D. Pa. 1991) (discussing the police as "an industry so intensely regulated that its employees' expectations of privacy are necessarily and predictably diminished").

---

In *Fraternal Order of Police*, the Police Commissioner required answers to a broad range of medical information for police officers applying to a "special investigations unit." 812 F.2d 105, 113. The police officers attempted to enjoin the city from requiring these disclosures. *Id.* The Third Circuit upheld the medical questionnaire. First, the Court held that the type of medical information being requested was similar to that required by all applicants to the police department. *Id.* at 113-14. Therefore the Court held that where "disclosures of confidential information has historically been required by those in similar positions, their expectation of privacy in that type of information is reduced." *Id.* at 114. Second, the Court upheld the questionnaire "[b]ecause the medical information requested is directly related to the interest of the police department in selecting officers who are physically and mentally capable of working in dangerous and highly stressful positions, sometimes over long periods of time, and because police officers have little reasonable expectation that such medical information will not be requested." *Id.*

There exists a compelling government interest in regulating the police. *Policemen's Benevolent Association*, 850 F.2d at 141. The Third Circuit has held that the police officers are "members of quasi-military organizations, called upon for duty at all times, armed at almost all times, and exercising the most awesome and dangerous power that a democratic state possesses with respect to its residents-the power to use force to arrest and detain them." *Id.; accord Carroll*, 233 F.3d at 211 ("[T]he state has a general interest in ensuring that those who have sworn to uphold the law are not themselves law-breakers."); *Ford,* 931 F.2d at 1290 ("In view of the threat present when such an employee [police officer] is inhibited by drugs or alcohol or is otherwise not fully capable of performing his or her duties, the Government has a legitimate interest in assuring that such an employee is drug- and alcohol- free.").

Here, we are not dealing with the more difficult circumstance of a suspicionless search of a police officer. Rather, Chief Comey had reasonable suspicion to mandate drug testing of the police officers. The reasonable suspicion standard is not difficult to meet, and is a lesser standard of proof than probable cause. *Von Raab*, 489 U.S. at 665-66. It is an objective standard that is directed at a particular individual. *Copeland v. Pa. Police Dept.*, 840 F.2d 1139, 1144 (3d Cir. 1988). The factors to consider are "(1) the nature of the tip or information; (2) the reliability of the informant; (3) the degree of corroboration; and (4) other facts contributing to suspicion or lack thereof." *Id.* (internal quotation omitted).

The facts here demonstrate that Chief Comey acted appropriately under the circumstances. Chief Comey received credible information that as many as fifty of his police officers were visiting a pharmacy in New York City that was under investigation for its distribution of illegal steroids. He received this information from a captain of the NYPD Internal Affairs bureau, who was investigating the use of illegal steroid by NYPD officers. Chief Comey acted quickly to ensure that JCPD officers were not using steroids that would make them dangerous and unfit for duty. This is a very significant concern. He immediately mandated drug tests and disclosures of medical information, and hired the Boylan Defendants to help aid in determining whether a police officer was fit for duty when the officer engaged in steroid use.

Second, even if alternatively the Court concluded that it was ambiguous whether a federal law was violated, Chief Comey would still be entitled to qualified immunity. Under the second step, the Court considers whether it would be objectively reasonable for the officer to know that his actions were unlawful in the situation presented. Here, Chief Comey was informed that Plaintiffs were customers of an obscure pharmacy in New York City (even though Plaintiffs are police officers

in Jersey City, New Jersey) that was being investigated for selling unlawful steroids. As the chief of police, it was objectively reasonable for Comey to believe that he was obligated to ensure that his police officers were not medically unfit for duty. Police officers are provided a great amount of responsibility in our communities, and the mental and physical health of police officers is of the utmost concern.

Plaintiffs also argue that Defendants violated the AG Policy.[9] According to Plaintiffs, the JCPD violated the AG Policy because the policy does not mention steroids as one of the drugs to be tested for under the guidelines.[10] Additionally, Plaintiffs argue that because the steroids were medically prescribed by a physician the AG drug policy would not apply at all and any drug testing was impermissible. Plaintiffs argument is misplaced. The AG Policy does not affect this Court's analysis of Plaintiffs' federal constitutional rights. The government's compelling interest in assuring that police officers are medically fit for duty is not proscribed because of the AG Policy. Marijuana is not listed as a drug substance, yet it has been considered a serious allegation that mandates drug testing by a police department. *Garrison v. Dept. of Justice*, 72 F.3d 1566, 1569 (Fed. Cir. 1996). Likewise, alcohol is not listed or illegal but cases have discussed the importance of ensuring that police officers are not impaired by alcohol abuse. *See Ford*, 931 F.2d at 1308 (citing *McDonell v. Hunter*, 809 F.2d 1302, 1309 (8th Cir. 1987)). There is no basis for arguing that because a state policy only mentions certain types of illegal drugs then the Court should apply a different Fourth

---

[9] Available at http://www.njdcj.org/agguide/drugtest2001.pdf. (revised June 2001) (last visited May 20, 2010). The Court may consider this document because is was incorporated by reference in the complaint. (Kramer Am. Compl. ¶¶ 49, 59, 66, 72.)

[10] The AG Policy lists the following substances: (a) amphetamine/methamphetamine; (b) barbiturates; (c) benzodiazepine; (d) cannabinoids; (e) cocaine; (f) methadone; (g) phencyclidine; and (h) opiates.

Amendment analysis, or alter the constitutional rights at issue. In *Carroll v. City of Westminster*, the court held that it was irrelevant that the "drug test here was not conducted pursuant to comprehensive regulations" that permitted more narrow intrusions. 233 F.3d 208, 212 (4th Cir. 2000). The validity of the drug test did not "hinge" on any "permissible limits." *Id.; accord Copeland*, 840 F.2d at 1147 (holding that the lack of written polices governing drug testing was irrelevant to the court's analysis of plaintiffs' constitutional rights). In *Carroll*, there existed a reasonable, individualized suspicion that the police officer was abusing drugs and the department acted accordingly. Any drug impairment that affects a police officer's abilities is a significant concern. Drug abuse of any form affects a person's abilities and reasoning, and in the case of a police officer it may cause great harm to the public.

Ultimately, the *Carroll* court held that "[t]he Department would have been derelict in its duty if it had ignored a plausible report that one of its officers was abusing drugs." *Id.* at 212. This Court wholeheartedly agrees. Chief Comey was presented with serious and credible information that his police officers may have been abusing steroids on a large scale. He acted reasonably and did nothing improper. Therefore, qualified immunity is granted to Chief Comey.

Plaintiffs also allege a First Amendment retaliation claim based upon the same underlying facts. (Kramer Am. Compl. ¶¶ 72-73, 99-102.) The Court grants Chief Comey qualified immunity as to this claim as well. In order to establish a claim for First Amendment retaliation, a plaintiff must allege: "(1) constitutionally protected conduct, (2) retaliatory action sufficient to deter a person of ordinary firmness from exercising his constitutional rights, and (3) a causal link between the constitutionally protected conduct and the retaliatory action." *Thomas v. Independence Twp.*, 463 F.3d 285, 296 (3d Cir.2006) (citing *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir.2003)). Plaintiffs

plead that they were retaliated against for complaining about the drug testing procedures. However, Plaintiffs do not plead independent adverse employment actions that occurred because of protected speech. Plaintiffs allege they were retaliated against by "continued impairment of overtime and off-duty job opportunities, district assignments and other sundy effects." The Court has ruled that being placed on modified duty was not a violation of Plaintiffs' federal rights. Plaintiffs' allegations are insufficient to establish a causal connection between any protected speech and retaliatory action that is independent of the conduct taken by Chief Comey to place the Plaintiffs on modified duty. The Court in viewing the facts in a light most favorable to Plaintiffs concludes that they have "failed to allege a violation of a clearly established constitutional right." *Herman v. Carbon County*, 248 F. App'x 442, 444 (3d. Cir. 2007) (citing *Saucier v. Katz*, 533 U.S. at 201-202).

### 2. Defendant Carione and the City of New York

Based upon the same rationale discussed above, the Court grants qualified immunity to Defendant Carione. Captain Carione worked for the NYPD Internal Affairs Bureau and was investigating illegal steroid abuse among members of the NYPD. Plaintiffs allege that Carione and the NYPD violated their constitutional rights by informing the JCPD of the names of officers that frequented Lowen's. The Court determined above that police officers have a diminished expectation of privacy, especially where the privacy is balanced against the government's concern that they may be unfit for duty. Here, Captain Carione provided Chief Comey with a list of names of officers who had prescriptions filled at a pharmacy in New York City that was under investigation for selling illegal steroids. Qualified immunity applies to his conduct. Any expectation of privacy by a plaintiff choosing a pharmacy cannot overcome the important government interests at stake here. Additionally, Carione's actions were reasonable. He was involved in an ongoing investigation

concerning police officers and illegal steroids. He was prudent in sharing the information of an ongoing investigation with the JCPD. Defendant Carione is entitled to qualified immunity.

### 3. The Boylan Defendants

The Boylan Defendants argue that (1) they are not state actors for purposes of § 1983 and (2) if they are determined to be state actors then qualified immunity would apply to their conduct. The determination of whether the Boylan Defendants are "state actors," may require discovery; but the liability of the Boylan Defendants under a qualified immunity analysis is straightforward. The Boylan Defendants were hired by Defendant Comey and the JCPD to evaluate Plaintiffs' drug test results. Since the Court concluded that qualified immunity protects Chief Comey, it likewise extends to the Boylan Defendants. The sole role of the Boylan Defendants was to provide medical recommendations to Chief Comey as to whether each Plaintiff's Testosterone/Epitestosterone levels were too high to be fit for duty. Because Defendant Comey violated no constitutional rights in requiring the drug testing, it goes without saying that the Boylan Defendants also violated no constitutional rights in simply providing a medical opinion to the JCPD with regard to Plaintiffs' Testosterone/Epitestosterone levels. The Boylan Defendant's motion to dismiss is granted.[11]

---

[11] Plaintiffs also allege a violation of the Americans with Disabilities Act ("ADA") against Dr. Boylan. This claim has no merit. The Third Circuit has held that there is no individual liability under the ADA. *Emerson v. Thiel College,* 296 F.3d 184, 189 (3d Cir. 2002) ("This result comports with decisions of other courts of appeals holding that individuals are not liable under Titles I and II of the ADA, which prohibit discrimination by employers and public entities respectively."). Moreover, the Boylan Defendants were not Plaintiffs' employers and are not a "covered entity" under the ADA. The ADA specifically prohibits any "covered entity" from discriminating against individuals on the basis of a disability, and "the term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee." *Lekich v. Pawlowski,* 2010 WL 145107, at *2 (3d Cir. 2010) (internal citations omitted). The Boylan Defendants do not qualify as a covered entity.

4.  **Municipal Liability: Cities of New York and Jersey City**

Likewise, there are no independent allegations against the City of Jersey City or New York City. Plaintiffs do not allege a separate policy that they claim violated their rights, only that through Comey and Carione's actions the municipalities are also liable. Where a "person has suffered no constitutional injury at the hands of the individual" then there can be no liability for the municipality based upon the same act. *See City of Los Angeles*, 475 U.S. 796, 800 (1986); *see also Jones v. City of Newark Police Dep't*, No. 03-0017, 2006 WL 1228723, at *5 (D.N.J. May 5, 2006). "[F]or there to be municipal liability, there still must be a violation of plaintiff's constitutional rights." *Brown v. Commonwealth of Pa.*, 318 F.3d 473, 482 (3d Cir. 2003) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 122 (1992)). Thus, the municipality claims are dismissed.

## III.  CONCLUSION

Defendants motions to dismiss pursuant to Rules 12(b)(6) and 12(c), based upon the doctrine of qualified immunity, are granted. The consolidated complaints are dismissed in their entirety.

June 3, 2010

_____
PETER G. SHERIDAN, U.S.D.J.